
IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CANVAS B. FORD,

    Plaintiff,                               No. CIV S-08-0690 EFB

    vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.                            ORDER

/

       Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under Title XVI of the Social Security Act ("Act"). For the reasons that follow, plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings as directed in this opinion. The Clerk is directed to enter judgment for plaintiff.

I. BACKGROUND

       Plaintiff, born April 12, 1981, formally applied for Supplemental Security Income ("SSI") on February 25, 2004. Administrative Record ("AR") 98-101. On June 30, 2004, his application was denied on the basis that he lacked the requisite disability. *Id.* at 57-61. He

1

requested reconsideration of the denial, which was denied on December 5, 2004. *Id.* at 64-68. On December 28, 2004, he formally requested a hearing on the denial. His hearing was held before administrative law judge ("ALJ") Mark C. Ramsey on April 11, 2006. *Id.* at 396-436. Plaintiff was represented by counsel at the hearing, and was the only person to testify. *Id.*

The ALJ issued a decision on November 7, 2006, finding that plaintiff is not disabled.[1] *Id.* at 36-45. The ALJ made the following specific findings:

> 1. The claimant has not engaged in substantial gainful activity since January 1, 2002, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairments: bipolar disorder and a history of polysubstance abuse (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

---

[1] Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 *et seq.* Disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits under the SSI program. *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

2

416.920(d), 416.925 and 416.926).

\*\*\*

4. After careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity: she is able to perform simple, repetitive tasks (unskilled work); she is precluded from work that requires frequent contact with the public; and, she is precluded from work that requires frequent contact with fellow employees.

\*\*\*

5. The claimant has no past relevant work (20 CFR 416.965).

\*\*\*

6. The claimant was born on April 12, 1981, and was 22 years old on the date the application was filed, which is defined as a younger individual age 18-44 (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

\*\*\*

10. The claimant has not been under a "disability," as defined in the Social Security Act, since February 25, 2004 (20 CFR 416.920(g)), the date the application was filed.

*Id.* at 41-45.

Plaintiff requested that the Appeals Council review the ALJ's decision. *Id.* at 34-35. On February 23, 2007, the Appeals Council granted plaintiff's request for review and remanded the case to the ALJ with instructions for a new hearing. *Id.* at 79-80. The Appeals Council stated:

> The Administrative Law Judge's decision found that the framework of section 204.00 of the Medical-Vocational guidelines, directs a finding that the claimant is not disabled. The Council finds that the decision is not supported by substantial evidence.

3

> The Administrative Law Judge concluded that the claimant's nonexertional limitations have little or no effect on the unskilled work base at all exertional levels. Included in the nonexertional limitations was a restriction to simple, repetitive work, no frequent contact with the public or with fellow employees. These mental restrictions require vocational testimony as to their impact on available jobs in the national economy.
>
> Upon remand the Administrative Law Judge will:
>
> Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).
>
> • Obtain additional evidence concerning the claimant's mental impairment in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 416.912-913). The additional evidence may include, if warranted and available, a consultative mental status examination and medical source statements about what the claimant can still do despite the impairment.
>
> • If applicable, conduct the further proceedings required to determine whether drug addiction is a contributing factor material to any finding of disability.

*Id.*

A supplemental hearing was then held before ALJ Ramsey on October 12, 2007. *Id.* at 336-95. Plaintiff was again represented by counsel at the hearing. Along with plaintiff, Medical Expert Sidney Walter and Vocational Expert ("VE") Susan Creighton-Clavel testified at the hearing. *Id.* That testimony is discussed at length below.

////

////

4

On November 27, 2007, the ALJ again denied plaintiff's disability benefits. *Id.* at 11-23. The ALJ found:

> 1. The claimant has not engaged in substantial gainful activity since February 25, 2004, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> ***
>
> 2. The claimant has the following severe impairments: bipolar disorder, borderline personality disorder and a history of drug abuse (20 CFR 416.920(c)).
>
> ***
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> ***
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to performing simple unskilled work with no close or frequent supervision.
>
> ***
>
> 5. The claimant is capable of performing past relevant work as a cashier at Shell. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).
>
> ***
>
> 6. The claimant has not been under a "disability," as defined in the Social Security Act, since February 25, 2004 (20 CFR 416.920(f)), the date the application was filed.

*Id.* at 16-22.

Plaintiff requested that the Appeals Council again review the ALJ's decision, and on February 9, 2008, the Appeals Council denied review, leaving the ALJ's decision as the "final decision of the Commissioner of Social Security." *Id.* at 7-9.

////

5

II. SUMMARY OF TESTIMONY AT OCTOBER 12, 2007 ADMINISTRATIVE HEARING

Plaintiff, Medical Expert Dr. Sidney Walter, and VE Susan Creighton-Clavel testified at plaintiff's October 12, 2007 hearing. Plaintiff testified that she was 26 years old, right-handed, and single. AR 339. She related that she had completed only nine years of school and had not received her GED. She stated that she stopped attending adult school for her GED when she got a job. AR 341. She reported that she worked as a cashier at a Shell gas station for one year, worked at Round Table restaurant, and DD's restaurant for a total of ten months. She informed the Court that she was fired from DD's because she yelled at her supervisor. "They were doing things to me and I kept ignoring it and then I just went off one day." AR 342-43. Plaintiff testified that she was not currently working and had stopped working at DD's on June 2, 2007. Plaintiff explained that her work at DD's involved going into the back room, bringing out products and putting them on shelves. AR 344.

Plaintiff confirmed that she changed the sheets on her bed, did her laundry, vacuumed, mopped the kitchen and bathroom floors, scrubbed out her own bathroom shower/ tub, and prepared four meals a day. AR 345. She testified that she always grocery shopped with someone else, either her mother, or her boyfriend, and went about once a week and was in the store for about an hour. She stated that she did not do any outside work or yard work at all, she did not go to church, she went to the movies about seven times a year, and she did not play any form of sports. AR 346. She stated that she did drawing and wrote stories for enjoyment, that she walked every day for an hour, she went to fast food restaurants and the mall with her cousin, and she ran errands and went to the park with her male friend. AR 347-48.

Plaintiff stated that she did not have a driver's license because she had failed the written test twice, that the only drug she took was Zyprexa, that she last used marijuana about three year's ago and only used alcohol once in her entire life. AR 350-54. Plaintiff insisted that she had no idea how she tested positive for cocaine but admitted trying Ecstasy once. AR 352-54.
////

Plaintiff explained that she used the term "feel like a crack head," merely as a "figure of speech." AR 353.

The ALJ and attorney Shore agreed that plaintiff worked part-time as a gas station cashier during 2001 and 2002. AR 355-357. Plaintiff testified that she left that job because she had to move; her job was in Rancho Cordova and she moved to Vallejo with her brother. She testified that the reason she moved from Sacramento was that she lost her place of lodging and could not find anything else. AR 357, 358. Plaintiff stated that when she worked at DD's, she worked about 20 to 30 hours per week and grossed about three to four hundred dollars. She confirmed that she "went off" on her supervisor at DD's but had been trying not to do that. AR 358. She testified that on that job, she was annoyed mainly by her supervisor, causing her to "go off," and that on a regular basis she thought people were messing with her head. She stated that when some people started messing with her head, "I go off." AR 359. "I get real angry and I black out. [Mr. Shore: You black out?] Yes. [Mr. Shore: Do you remember what you said to her?] No. [Mr. Shore: Have you gone off on other people?] Yes. [Mr. Shore: And you blacked out then?] Yes. [Mr. Shore: How often does this happen?] Almost every day. [Mr. Shore: Really, you get that angry?] Yes. [Mr. Shore: Who have you gotten angry with?] My mom, my boyfriend, my brothers. . . . Mainly the people that's close to me." AR 359, 360. She explained that she did not go off on strangers and did not mix with strangers, because "I get paranoid around people that I don't know." AR 361.

Plaintiff stated that she did not hear as many voices as previously and that her medication was helping. She said that she sometimes still heard voices when she was "real upset, I mean really angry." AR 365. She confirmed that the voices she heard could have been her mother or God telling her to do terrible things and that when she got those really bad voices "I black out. I don't remember anything." AR 365. She said that she tried to avoid doing what the voices said to do but in the past, she had done what she was told to do. AR 365. She testified that her voices had told her when she was about 12 years old to kill her mother's boyfriend because he

7

1  used to beat her all the time.  She stated that for the past couple of years she had been able to
2  avoid doing what the voices told her to do.  AR 365.

3  She stated that she was currently taking her medication on a regular basis, but had
4  stopped about a year ago for a time because she ran out.  She confirmed that three months prior
5  to going to the hospital, she stopped taking her medication.  "Because I was tired of taking pills
6  and I wanted to do it on my own."  AR 367.  She explained that she wanted to improve her
7  mental condition.  AR 367.

8  Plaintiff stated that a side effect of her medication was fatigue.  She explained that she
9  was unable to cope with fatigue and had to lay down every day for two hours straight.  She stated
10 that she would generally lay down at about eleven or twelve o'clock.  She further explained that
11 she got up at 8:00 a.m. and then had to lie down at eleven or twelve for a couple of hours.  AR
12 368.  She testified that she became fatigued when she was at work, and when she came home she
13 slept for three or four hours.  She further confirmed that her part-time work "really wore [her]
14 out."  AR 369.  She stated that her medication slowed her down.  AR 370.

15 Medical expert, Dr. Sidney Walter, testified that Exhibit 10F contained three references
16 to
17 cocaine abuse which, along with Zyprexa, would cause a major problem as far as concentration
18 and attention.  But Dr. Walter pointed out that as plaintiff had denied ever using cocaine, he had
19 no explanation for the cocaine reference in the medical records.  Plaintiff continued to insist that
20 she did not use it.  AR 370, 371.  Dr. Walter stated: "Overall, we have a person who has
21 symptoms of a bipolar condition and symptoms of a borderline personality disorder.  I think the
22 stronger emphasis would be a borderline personality disorder, which fits the descriptions of her
23 problems better than bipolar itself.  There's indication that she discontinued with compliance
24 with treatment and possibly that's because giving a person Lithium who has a bipolar condition
25 causes more of a problem than not.  But again, that's up to her treating physician to determine
26 what's best for her.  What we have here is a person who is inconsistent in her behavior based

8

upon the bipolar borderline personality and also bipolar symptoms.  At times she could function fairly well, at other times not, depending on her medication.  I would say if she takes medication consistently, she could do simple tasks from one to three steps in a fairly consistent behavior, but with as little supervision as possible.  If she's not taking medication she is in a serious state and is dysfunctional." AR 371.

The ALJ stated his conclusion, based on Dr. Walter's testimony, that plaintiff would be able to do simple unskilled work that "requires little supervision." AR 371.  Dr. Walter again emphasized that she would only be able to do this work if she was consistent with her Zyprexa use, and "[i]f the doctor monitors it very carefully." AR 372.  Dr. Walter opined that "supervision would be difficult . . . it would be difficult for her to accept supervision." AR 372.

Dr. Walter explained the nature of borderline personality disorder: "Generally, it's a person who is very dependent upon one other person and hates to be alone if possible.  They're totally dependent and have many symptoms that overlap into the bipolar condition. . . .  They have almost frantic efforts to avoid real or imagined abandonment. . . .  They don't want to be abandoned by anyone and they hang onto someone as long as they can even though they fight with that person, they'll make up quickly rather than be abandoned. . . .  They have unstable interpersonal relationships.  They also have impulsive behavior, self-mutilation such as cutting their wrists or scratching themselves or causing superficial injury to themselves.  They have alternating moods of depression and mania.  They have a chronic feeling of being empty, no feeling.  And they get very angry and have difficulty controlling their anger unless they're treated medically." AR 373, 374.  Dr. Walter confirmed that even though they would not want to be alone, they "have difficulty tolerating supervision."

Dr. Walter confirmed that Zyprexa was developed for use with schizophrenic disorders and was later used for the manic stages of bipolar disorder.  He confirmed that plaintiff was not receiving adequate medication for her borderline personality disorder.  Dr. Walter pointed out that the medications for borderline personality included Paxil and Zoloft; these medications

9

would not control her borderline personality disorder but would help with it. AR 374, 375. Dr. Walter testified that plaintiff met the Part A criteria to meet a listing but did not meet the Part B criteria because when she was taking medication she seemed to manage to function. Dr. Walter confirmed that if she was not taking medication for both her bipolar and borderline personality disorders, she would not be able to function.

Dr. Walter provided an explanation of what "marked" deficiency would mean under the Part B criteria. "Dysfunction in an activity such as daily living she needs to depend on someone else to do most of the daily activities. Social functioning, she cannot tolerate other people, gets into arguments frequently. Concentration, persistence or pace, it would last about 15 to 20 minutes and then she could not continue her concentration and attention. And decompensation is over periods of time, three or four periods of decompensation where she goes to a relapse that lasts for months at a time." AR 377.

Dr. Walter confirmed that it would be expected at times for plaintiff to be markedly impaired in her concentration, persistence and pace even if she was properly medicated. AR 377, 378. Dr. Walter explained the side effects from Zyprexa: "Yes, most of it is sleep, a feeling of drowsiness, a feeling of apathy, a feeling of being slightly down." He opined that he did not feel that it would cause a person to require a nap, "[b]ut they could not function at anything that requires high pace." AR 378. Dr. Walter clarified that her concentration, persistence and pace were markedly impaired without medication and moderately impaired if she was taking the appropriate medications. *Id*.

The following exchange occurred regarding the percentage of time plaintiff would suffer marked disability if taking medications:

[ALJ]: Now you said she was moderate to marked in concentration and pace.
[Dr. Walter]: Yes.
[ALJ]: If she's taking –
[Dr. Walter]: When –
[ALJ]: – her medication –
[Dr. Walter]: – she's not taking medication it's marked.
[ALJ]: Marked if not taking medication.

10

| | | |
|---|---|---|
| 1 | [Dr. Walter]: | Yes. |
| | [ALJ]: | Moderate if taking medication? |
| 2 | [Dr. Walter]: | Yes. |
| | [ALJ]: | Okay. |
| 3 | [Attorney]: | I thought you said, Doctor, even with her medication you told me there might be times when she – |
| 4 | [Dr. Walter]: | At times it would be marked due to the bipolar condition, but overall I would say if she'd take the medication she's manageable. |
| 5 | [Attorney]: | Would you say ten percent would be marked or 20 percent of the time or – |
| | [Dr. Walter]: | It's pretty hard to judge by percent. I would say, from the history I'm looking at, well, see the history indicates when she's not taking medication she's very severe. |
| 6 | | |
| 7 | [Attorney]: | Right. |
| | [Dr. Walter]: | When she's taking the medication it's non-severe so it's pretty hard to guess at this. I would say based on the borderline personality it'd be close to ten percent, yes, if you're going to use percent. |
| 8 | | |
| 9 | [Attorney]: | Okay. |
| | [Dr. Walter]: | And that's just hard to do, but it's – |
| 10 | [Attorney]: | It's sort of a rough idea – |
| | [Dr. Walter]: | It's very rough. |
| 11 | [Attorney]: | – ten percent. Do – might this, I guess this could run together though, if you had 100 percent continuum she might have it all at one time and then not have it for a while? |
| 12 | | |
| | [Dr. Walter]: | Well, it depends. If her boyfriend abandoned her you'd have a person going into a marked condition. |
| 13 | | |
| | [Attorney]: | Um-hum. And that could last for a long time? |
| 14 | [Dr. Walter]: | Well, you don't. It depends on other factors in – |
| | [Attorney]: | Right. |
| 15 | [Dr. Walter]: | – a person's life. |

AR 378-79. Dr. Walter testified that plaintiff would be able to do simple unskilled work, about one to three steps, but "[s]he could not accept supervision . . . . Very little supervision." AR 380, 381.

The VE began her testimony. The ALJ concluded that plaintiff's past relevant work included cashier work and retail store stocking. AR 381-83. The ALJ posed a hypothetical question to the VE indicating that the hypothetical person was able to do simple, unskilled work in jobs requiring very little supervision. "Jobs where you interact with your supervisor very little." AR 384. The VE testified that she would be able to do the work of cashier at the Shell Service Station, but would not be able to work as a laborer at the discount store because of substantial interaction with the supervisors and having significant pressure to get things stocked quickly. AR 385. The VE testified that because the psychologist used the position "janitor" in

his explanation of a job requiring little supervision, that she was able to perform that job. She further testified that the hypothetical person was able to work as a warehouse worker, a garment sorter, and a laundry classifier. AR 385, 386.

The VE testified that under the general rule, an employee would be allowed one day absence per month. AR 386. Plaintiff's attorney attempted to pose a hypothetical to the VE regarding plaintiff's markedness ten percent of a work month, and confusion ensued:

| | | |
|---|---|---|
| [Attorney]: | | . . . If a person was markedly impaired, in other words, severely impaired from performing – from their concentration and persistence and pace was markedly impaired at least ten percent of the actual work period, not bathroom breaks or time off; and that means, marked meaning severe, no useful ability. Would that person be able – |
| [ALJ]: | | Where's it defined? Where's your definition of marked? |
| [Attorney]: | | The regulations define marked – moderate as – marked as severe and mild as minimal and moderate as more than minimal, but less than marked. |
| [ALJ]: | | You can still satisfactorily perform the job. |
| [Attorney]: | | No, that's not the regulations I don't believe, Your Honor. |
| [ALJ]: | | Yeah, that's the – there is no definition of moderate in the regulations. |
| [Attorney]: | | Right. |
| [VE]: | | The only definition are on Social Security forms, which define moderate as there are limitations, but you can still satisfactorily – |
| [Attorney]: | | There is the – |
| [ALJ]: | | – perform the job. |
| [Attorney]: | | – other forms which I presented here before that's had different definitions. |
| [ALJ]: | | They aren't Social Security forms. |
| [Attorney]: | | They were. |
| [ALJ]: | | You want me to get the form? Let's go off the record. |
| [Attorney]: | | All right. I know that form, but I had a different form when we read it off. |
| (At this point, the ALJ went off the record.) | | |
| (On the record.) | | |
| [ALJ]: | | Okay. This is the medical – this is the form that Social Security uses, medical source statement of ability to do work related activities, mental. It's the latest form, HA-1152-U3. Moderate is defined, there's more than a slight limitation in this area, but the individual's still able to function satisfactorily. Marked is defined, there's a serious limitation in this area. There is a substantial loss of ability to function, effectively function. Extreme, there's a major limitation in this area. There is no useful ability to function in this area. So those are the definitions of moderate, marked and extreme. There's also a definition of none and mild. So let's see, where were we? Okay. You were posing a hypothetical where at ten percent of the time there'd be a marked limitation? |
| [Attorney]: | | Right. The person was basically, within the work period, not with breaks, or bathroom breaks or lunch time, but ten percent of the period, that person – |
| [ALJ]: | | Ten percent at one time or is it ten percent – |

| | | |
|---|---|---|
| 1 | [Attorney]: | Ten percent at one – |
|   | [ALJ]: | Ten percent over an eight hour day? |
| 2 | [Attorney]: | Ten percent over an eight hour day. |
|   | [ALJ]: | So if you had ten percent – |
| 3 | [Attorney]: | And ten percent – |
|   | [ALJ]: | – loss in her functioning? |
| 4 | [Attorney]: | – over a monthly work week – |
|   | [ALJ]: | What, ten percent of the time or a ten percent loss in – of functioning? |
| 5 | [Attorney]: | Ten percent of the time – |
|   | [ALJ]: | Ten percent. |
| 6 | [Attorney]: | – there'd be a marked – |
|   | [ALJ]: | Would it happen all at once for a period during the day or – |
| 7 | [Attorney]: | I suppose if it was marked it'd have to be – there would be a ten percent marked loss.  It might be aggregate or it might be at one time. |
| 8 | [ALJ]: | Well, you have to – you need to put it in the hypothetical whether it's aggregate or at one time. |
| 9 | [VE]: | Well, I have to look at how we define those things in work settings and it's occasional, which is up to one-third of the time. |
| 10 | [Attorney]: | Well, I'm telling you – |
|    | [ALJ]: | This is – |
| 11 | [VE]: | Frequent is one-third so – |
|    | [ALJ]: | This is – |
| 12 | [VE]: | – a ten percent would fall under the occasional category. |
|    | [ALJ]: | Well, it actually would be less than occasional.  Occasional is one-third of the time. |
| 13 | [VE]: | Right, but in the vocational things we only have occasional, frequent or constant. |
| 14 | [ALJ]: | So it'd be occasional. |
| 15 | [VE]: | So occasional is anything up to one-third of the time – |
|    | [ALJ]: | Okay. |
| 16 | [VE]: | – which that sounds like it would fit, the ten percent would fit into that. |
|    | [Attorney]: | I'm saying this person is functional absent for ten percent of the time – |
| 17 | [ALJ]: | Well, that's – |
|    | [VE]: | So it would be extreme. |
| 18 | [Attorney]: | – which is more than one day. |
|    | [ALJ]: | Your first definition, occasional, if ten percent at a time she had this occasional marked ability could she still perform the three jobs you identified? |
| 19 | | |
| 20 | [VE]: | Well, I forgot what the category is.  We were talking about it so long. |
|    | [ALJ]: | Okay.  Well, I'm messing – |
| 21 | [VE]: | What was – |
|    | [ALJ]: | – with your hypothetical.  It's your hypothetical.  Why don't you give it? |
| 22 | [VE]: | – the category? |
|    | [ALJ]: | I won't interfere anymore. |
| 23 | [Attorney]: | Attention, concentration and pace. |
|    | [VE]: | And pace.  Okay. |
| 24 | [Attorney]: | And this person was, our hypothetical person is functional absent ten percent of a work month. |
| 25 | [VE]: | Okay. |
|    | [Attorney]: | That's be more than eight hours a day.  Would this – would that be acceptable to the average employer? |
| 26 | | |

13

1  [VE]:         I think that the jobs that I've identified that would not be a problem with an occasional limitation like that –
2  [Attorney]:   Now if this –
   [VE]:         – because they're not.
3  [Attorney]:   – came out to be more than the one day a month absence that is allowable, you still think that would be an okay situation?
4  [VE]:         If a person had to miss one day a week, a month –
   [Attorney]:   Um-hum.
5  [VE]:         – that would be all right. That would be an okay situation. If they had to miss two or three days a month consistently –
6  [Attorney]:   Um-hum.
   [VE]:         – that would not be an okay situation.
7  [Attorney]:   Right. And I'm saying our ten percent comes out to be more than the one percent – the one day a month that you've identified. It would be at least two days a month functionally absent.
8  [VE]:         Well, I don't understand that because if it's ten percent of a month, ten percent of a month is not even going to equal one full day. And if a person can miss one full day –
10 [Attorney]:   Well, let's assume they miss two full days.
   [VE]:         Well, then they can't do it. I've already said that.
11 [Attorney]:   Functionally two full days, okay.
   [VE]:         They can't do two full days, but ten percent of, let's see, I mean I don't know. I don't have a calculator. I'm not a mathematician here, but ten percent of a day or a week – it would be easier to figure out ten percent of – ten percent of 40 hours, wouldn't that be four hours?
   [ALJ]:        Yes.
14 [VE]:         Okay. So in a week it'd be four hours.
   [Attorney]:   Um-hum.
15 [VE]:         So they couldn't do it under that situation.
   [Attorney]:   Okay. Now if – could our person take unscheduled breaks – the same sort of question really, but for an hour, two hours at a time if necessary during their work shift to lay down?
17 [VE]:         No, they couldn't.
   [Attorney]:   Okay.
18 [VE]:         They couldn't perform any jobs.
   [Attorney]:   All right. Thank you.

AR 388-94.

III. <u>ISSUES PRESENTED</u>

Plaintiff moves for summary judgment, contending that the ALJ committed three principal errors in finding plaintiff "not disabled." Plaintiff argues first that the ALJ failed to properly assess plaintiff's residual functional capacity ("RFC") and pose a legally adequate hypothetical to the vocational expert; second that the ALJ failed to develop the record and order a consultative psychiatric examination or request an RFC statement from her treating

14

1  psychiatrists; and third that the ALJ failed to credit plaintiff's testimony and third party
2  statements regarding her functional limitations without a legitimate basis for so doing.  As
3  discussed below, because the court finds that remand for further proceedings is required, the
4  court does not specifically address each of these alleged errors.

## IV. LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

## V. ANALYSIS

Plaintiff's argument that the ALJ erred by failing to properly assess plaintiff's RFC and, as a result, failed to pose a legally adequate hypothetical to the VE, is predicated on ALJ's interpretation of the testimony of Dr. Walter. Pl.'s Mot. for Summ. J. at 38. Plaintiff contends, *inter alia*, that the ALJ's RFC finding "failed to accurately reflect the findings of the medical

1 expert, Dr. Walter, regarding [plaintiff's] moderate to marked limitations in concentration,
2 persistence, and pace." *Id.* at 39.  Specifically, plaintiff contends that Dr. Walter estimated
3 plaintiff would experience "marked" limitations 10% of the time, *even while on medication*, and
4 the ALJ erred by failing to consider that limitation in his RFC and hypothetical.

Defendant counters that the ALJ's finding that plaintiff had the residual functional capacity to perform the full range of work at all exertional levels, but was limited to performing simple, unskilled work with no close or frequent supervision was supported by substantial evidence in the record.  Therefore, defendant argues, the ALJ's hypothetical questions posed to the VE at the hearing, which were based on those limitations, were proper.  Def.'s Mot. for Summ. J. at 9.  Defendant asserts that plaintiff's criticism of the ALJ's RFC finding as failing to take account of Dr. Walter's opinion that she would have "marked" limitations 10% of the time is without merit, because Dr. Walter only determined that plaintiff would be marked about 10% of the time *when not taking her medication. Id.* at 10.

Unfortunately for defendant, the ALJ interpreted Dr. Walter's testimony the same way. In his discussion of plaintiff's RFC, the ALJ cited Dr. Walter's testimony that at times, plaintiff "would be marked about 10% of the time *when not taking her medication*, in her ability to maintain concentration, persistence or pace."  AR 21 (emphasis added).  However, it appears that both defendant's argument and the ALJ's RFC finding were based on an inaccurate statement of Dr. Walter's testimony.  The transcript of the October 12, 2007 remand hearing reveals the following exchange between plaintiff's attorney and Dr. Walter:

> [Attorney]: I thought you said, Doctor, *even with her medication* you told me there might be times when she –
> [Dr. Walter]: At times it would be marked due to the bipolar condition, but overall I would say if she'd take the medication she's manageable.
> [Attorney]: Would you say ten percent would be marked or 20 percent of the time or –
> [Dr. Walter]: It's pretty hard to judge by percent.  I would say, from the history I'm looking at, well, see the history indicates *when she's not taking medication she's very severe*.
> [Attorney]: Right.

////

16

| | | |
|---|---|---|
| [Dr. Walter]: | *When she's taking the medication it's non-severe so it's pretty hard to guess at this. I would say based on the borderline personality it'd be close to ten percent, yes, if you're going to use percent.* | |
| [Attorney]: | Okay. | |

AR 378.  Albeit confusing, a review of the exchange reveals that plaintiff's attorney was specifically asking Dr. Walter about plaintiff's condition *when she is on medication*.  Although Dr. Walter's precise response regarding the ten percent figure is arguably ambiguous, he does state that when she's taking the medication, her condition is non-severe, and then estimates a ten percent figure.  Dr. Walter's ten percent figure appears from the transcript to be a reference to the sentence which immediately preceded it, which referred to plaintiff's condition *when she is on medication*.  Indeed, the plaintiff's attorney was quite pointed in qualifying the question in this regard.  The entire line of questioning commenced with plaintiff's attorney's question regarding plaintiff's condition *when she is on medication*, and by the fact that Dr. Walter called plaintiff's unmedicated condition "severe" and her medicated condition "manageable."  By definition, a "severe" impairment "significantly limits" a claimant's "physical or mental ability to do basic work activities."[2] 20 C.F.R. § 404.1520(c).  A ten percent impairment would not be "severe," and would much more likely be referred to as "manageable."  In this context, it is apparent from the transcript that Dr. Walter opined that plaintiff would be marked ten percent of the time, even when she is on medication.

Notwithstanding Dr. Walter's testimony that even when properly medicated, plaintiff condition remains marked ten percent of the time, this limitation was not included in the ALJ's RFC determination, nor was it specifically considered or rejected by the ALJ.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia*,

---

[2] The ability to work refers to "the abilities and aptitudes to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying and handling, as well as the capacity to see, hear, speak, understand, carry out and remember simple instructions, use judgment, respond appropriately to supervisors, coworkers and usual work situations, and to deal with changes in a routine work setting.  20 C.F.R. § 416.921(b).

17

medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. SSA*, 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)); *see also* SSR 96-8p ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."); 20 C.F.R. § 404.1527 ("Regardless of its source, we will evaluate every medical opinion we receive.").

In fact, not only did the ALJ not consider Dr. Walter's testimony that plaintiff would have a ten percent markedness even when medicated, he specifically mis-stated Dr. Walter's testimony to suggest that plaintiff was far less limited – that she only suffered a ten percent limitation when *not* medicated. This mis-statement is especially concerning, given that the ALJ specifically stated that he "adopted the medical opinions of [Dr. Walter] as being the most reliable [opinion evidence] in establishing [plaintiff's] residual functional capacity given his review of the medical record and hearing the testimony of the claimant." AR 22.

Not only did the ALJ mis-state plaintiff's limitations in his determination of plaintiff's RFC, but he also failed to include the proper limitations in his hypothetical questions to the VE. "Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant . . . 'If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no evidentiary value.'" *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)). Instead, the ALJ posed a hypothetical to the VE based on an incomplete and inaccurate statement of plaintiff's limitations, and the VE found that plaintiff could perform her past work as a cashier at a Shell gas station. AR 385. In light of the ALJ's improper hypothetical, that conclusion by the VE has no evidentiary value. Accordingly, the ALJ's determination that plaintiff "is capable of performing her past relevant work as a cashier at Shell" is unsupported by the evidence, and

plaintiff is entitled to remand.  AR 22.

Plaintiff contends that "[h]ad the ALJ credited Dr. Walters's testimony that Ms. Ford would have 'marked' limitations 10% of the work-day, and credited the VE's testimony regarding the acceptable level of absence from work, a finding of disability would have followed."  Pl.'s Mot. for Summ. J. at 40.  While it is true that the VE testified that the hypothetical person would be unable to perform the indicated jobs if she missed the equivalent of two days of work per month, AR 393, and would not be able to perform any jobs if she required unscheduled breaks or needed to lie down for one to two hours during a work shift, AR 394, the hypothetical questions posed to the VE were based on speculation regarding the meaning of Dr. Walter's testimony that plaintiff is marked ten percent of the time, even when on medication.  *See* AR 388-94.  Plaintiff's attorney even acknowledged at the hearing that the ten percent marked loss "might be aggregate or it might be at one time."  AR 391.  However, the VE was not specifically asked to consider, for example, whether plaintiff would be able to perform any jobs if she needed to take breaks throughout the day that are shorter than one to two hours.  Therefore, the matter must be remanded for clarification of Dr. Walter's testimony that plaintiff is marked "ten percent" of the time, even when on medication, and for a determination of plaintiff's vocational ability based upon a hypothetical that accurately reflects plaintiff's residual functional capacity, including Dr. Walter's "ten percent" limitation.  42 U.S.C. § 405(g).

Because a new hearing is required, the court does not reach plaintiff's other challenges to the ALJ's decision.

VI. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is granted;

2. The Commissioner's cross-motion for summary judgment is denied;

3. This action is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order; and,

19

4. The Clerk is directed to enter judgment for plaintiff.

DATED: September 29, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE